# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WANDA BALLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00857** |
| | ) | **Judge Aleta A. Trauger** |
| **PREMIER MEDICAL GROUP, P.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

The defendant moves to dismiss the Amended Complaint, which brings discrimination and retaliation claims under Title VII. For the reasons set forth herein, the defendant's Motion to Dismiss (Doc. No. 18) will be granted and this case will be dismissed without prejudice. Leave is granted to the plaintiff to file a Second Amended Complaint within 14 days, if discovery has revealed additional facts that substantiate any of her claims.[1]

## I.    PROCEDURAL HISTORY

Plaintiff Wanda Ballard has brought suit against her former employer, defendant Premier Medical Group, P.C. ("PMG"), alleging race-based discrimination, including disparate treatment, a hostile work environment, and constructive discharge (Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (Am. Compl. ("FAC"), Doc. No. 16 ¶¶ 31–40.) Ballard asks this court to enjoin the defendant from future

---

[1] The court apologizes that the Motion to Dismiss was not ruled on more promptly and that the parties have presumably engaged in substantial discovery. If the plaintiff does file a timely Second Amended Complaint, the defendant is encouraged to hold its arguments for a properly supported summary judgment motion instead of filing another motion to dismiss.

discrimination and retaliation, to reinstate the plaintiff to her job or award her front pay in the alternative, and to award her compensatory and punitive damages, costs, and fees. (FAC at 8.)

Ballard filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC Charge") and received her Notice of Right to Sue before filing this lawsuit. (*Id.* ¶ 7.)[2] The defendant filed a Motion to Dismiss (Doc. No. 18) with an accompanying Memorandum (Doc. No. 19), to which the plaintiff filed a Response (Doc. No. 25), and in further support of which the defendant filed a Reply (Doc. No. 26). The defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(6) and asks the court to dismiss the FAC with prejudice. (Doc. No. 18 at 1.)

## II.    FACTS[3]

The defendant is a medical practice for which the plaintiff handled insurance billing. Ballard, who is African American, worked for PMG from 2007 until April 2024, first as a Certified Medical Coder and eventually as a Coding Manager. (FAC ¶¶ 9, 29.) During her employment, PMG employed "very few African American employees," many of whom "were forced out or terminated." (*Id.* ¶ 11.) In 2012, Ballard "raised a verbal internal complaint of racial discrimination," which the FAC does not describe, by "her Caucasian supervisors," whom the FAC does not identify. (*Id.* ¶ 12.) After PMG's Human Resources department failed to investigate her

---

[2] The plaintiff did not file her EEOC Charge with this court, but the defendant attached a copy of it to its Memorandum in support of its Motion to Dismiss. (Doc. No. 19-1.) The court may consider the EEOC Charge in ruling on the Rule 12(b)(6) Motion because it is "referred to in the Complaint and . . . central to the claims contained therein." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 534 (6th Cir. 2012) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008)).

[3] Upon a motion to dismiss for failure to state a claim, the court accepts the complaint's well-pleaded facts as true and draws "all reasonable inferences" in the plaintiff's favor. *Romero v. City of Lansing*, 159 F.4th 1002, 1006 (6th Cir. 2025) (citing *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019)).

2

complaint, Ballard met with one of her supervisors, Chief Financial Administrator Missy Liverett, who is Caucasian,[4] and the Director of Human Resources at the time, who is also Caucasian, but PMG "still took no action." (*Id.*) "Soon after" her 2012 complaint, Ballard was demoted without justification.[5] (*Id.* ¶ 13.)

Roughly eight years later, in February 2020, Ballard raised another "discrimination complaint[]" with Liverett, explaining "to Liverett that the harassment and discrimination," which the FAC does not describe, "was based on Ballard's race." (*Id.* ¶ 14) Liverett "instructed Ballard to not mention race in her written complaint." (*Id.*) Roughly two years later, in "early 2022," Ballard made a presentation to PMG's four-person, all-Caucasian "Administration Team," during which she "outlined suggestions on how to build morale among the staff," including instituting "company-wide DEI initiatives and training." (*Id.* ¶¶ 15–16.)[6] Leadership thanked Ballard but did not implement her suggestions. (*Id.* ¶ 16.) Instead, after the meeting, the "discrimination and hostile work environment worsened," including unspecified "negative treatment from physicians and the administrative team," and, when Ballard reported the worsening conditions to Liverett, Liverett "continued to fail to act." (*Id.* ¶ 17.)

---

[4] Ballard does not clarify whether Liverett is one of the supervisors about whom she made the 2012 complaint.

[5] The FAC does not clarify the timeline of the plaintiff's roles with PMG. The court infers the following. Ballard was hired in 2007 as a Certified Medical Coder. She was promoted one or more times to Billing Manager by 2012, when she was demoted to an unspecified position as a result of her complaint. By the time Ballard separated from PMG, in 2024, she was a Coding Manager. It is not clear whether Billing Manager or Coding Manager is the more senior position or whether she had been promoted since her 2012 demotion.

[6] Ballard also suggested that company leaders (1) have "conversations with minority staff members in a group setting regarding office equality," (2) increase workplace diversity, and (3) "provid[e] staff "with a 'safe place/person' to discuss equality issues with." (FAC ¶ 16.)

Approximately one year later, in February 2023, Ballard met with other company administrators regarding her "concerns of a hostile work environment and discrimination," including "favoritism, unfair treatment, and conflicts of interest." (*Id.* ¶ 18.) The FAC does not specify what form the favoritism, unfair treatment, or conflicts of interest took, except to provide one example: the HR Director, who was also a Nurse Supervisor, "improperly trained" nurses, which caused billing errors that required the plaintiff to "consistently make the necessary corrections, adding to her workload." (*Id.*) The FAC does not state that the concerns Ballard reported related to her race. The administrators did not address the problems Ballard outlined, despite their promises. (*Id.*)

In addition, Ballard alleges that she was "ignored over simpler matters" during her time working for the defendant, and she provides two examples. (*Id.* ¶¶ 19–20.) In 2019, Ballard "submitted a work order" to have book cabinets installed her in office, but her request was ignored for one year, so she installed the cabinets herself. (*Id.* ¶ 20.) The plaintiff does not allege that her request was ignored because of her race, but she alleges that, thereafter, Ballard had her Caucasian colleagues place unspecified work orders on her behalf, which were promptly addressed. (*Id.*) As another example, in late 2022, Ballard asked the IT Director, who was Caucasian, for help with a "phone extension issue," but he did not help her until six months later, when Ballard included the Human Resources Manager on her email. (*Id.* ¶ 19.) By contrast, the "average response time turnaround" for IT requests was "no more than two days." (*Id.*) Ballard does not allege whether other IT requests she made were handled similarly or that the delay in this instance was due to her race.

During an unspecified period, which the court infers to be early 2023, the "hostile work environment worsened" because many departments had downsized, as a result of which Ballard

4

was given extra work, which "forced her into voluminous overtime hours," for which she was not additionally compensated because she was a salaried employee.[7] (*Id.* ¶ 22.) For example, in addition to her duties as Coding Manager, she also "became responsible for" the Billing, Credentialing and Industry departments, which entailed managing "at least" six additional employees. (*Id.*) She trained physicians and new staff and created training materials. (*Id.*) The FAC does not allege that Ballard was given increased work or not given extra pay because of her race or that any comparators were given less work or overtime pay. Rather, the FAC alleges race-neutral reasons for the extra work (downsizing) and lack of overtime pay (she was a salaried employee). (*Id.*)

During this time, Ballard worked from home on Tuesdays only. (*Id.* ¶ 23.) Because of her increased responsibilities, Ballard asked someone, whom the FAC does not specify, to work from home all the time, "like clinical supervisors and managers could,"[8] but that request was denied because, she was told, she was "needed on campus." (*Id.*) The FAC does not allege that her request was denied because of her race, that anyone else with her job duties was permitted to work remotely, the race of clinical supervisors who were allowed to work remotely, or that the

---

[7] The court construes the FAC as alleging that the downsizing caused the hostile work environment to worsen. The FAC actually states: "The hostile work environment worsened, and as many departments were already downsized, Ballard was given even more work that forced her into voluminous overtime hours without extra pay due to being on salary." (FAC ¶ 22.) Strictly construed, the plaintiff could be alleging two discrete facts: first, that the hostile work environment worsened, and, separately, that, because of downsizing, she was given increased responsibility without compensation. If that is the case, the FAC does not state what made the hostile work environment worse.

[8] The court construes the FAC's allegation that Ballard "requested to work remote" as a request for permission to work exclusively from home. (FAC ¶ 23.) And the court construes the FAC's allegation that *clinical* supervisors and managers were permitted to work remotely to imply that Ballard was not a clinical supervisor or manager, despite the plaintiff's characterization of the FAC as alleging the "denial of remote work flexibility available to similarly situated supervisors." (Doc. No. 25 at 3 (citing FAC ¶ 23).)

explanation she was provided was not genuine. Ballard also asked the defendant to hire more staff, but that request was denied, she was told, because of cost. (*Id.* ¶ 25 ("[Ballard] was told 'we can't afford more coders.'").) During an unspecified period "[w]hen working from the office," a sergeant with the Clarksville Police Department would "often park next to her office door," until she "began recording him." (*Id.* ¶ 24.) Ballard does not allege that the sergeant did so for reasons having to do with her race, that the sergeant knew it was her office he was parking next to, that he did so at the defendant's request, or how this affected her.[9]

Ballard also alleges interpersonal issues. "Around August of 2023," for example, the plaintiff reported to Liverett, her supervisor, that a physician "condescendingly referred to Ballard and her staff as 'her and her minions.'" (*Id.* ¶ 26.) Ballard does not allege that the physician's comment was racially tinged or directed at her because of her race, or that she reported as much to her supervisor. Liverett attributed the remark to the doctor's personality but "escalated the complaint to" the Chief Administrative Director. (*Id.*) Ballard does not allege what came of her complaint. Further, the plaintiff alleges that, during multiple conference calls with four of her colleagues, they "would not acknowledge [her] presence." (*Id.* ¶ 27.) These colleagues also once "discuss[ed] Ballard's son and his recent arrest" when they thought she had hung up. (*Id.*) In February 2024, the IT Director "tore Ballard's papers apart in front of her face" and threw them away because he was upset that Ballard had "completed a coding task without him." (*Id.* ¶ 28.) The FAC does not allege that the foregoing incidents occurred because of Ballard's race.

Ballard alleges that, on March 6, 2024, because of the "increasingly intolerable conditions and a hostile work environment that was severe and pervasive," she was "constructively discharged as she was ultimately left with no choice but to submit her resignation." (*Id.* ¶ 29.)

---

[9] The plaintiff does not refer to this allegation in her Response.

6

However, when Ballard's supervisor asked her to stay on for six more months, she "agreed to stay only through April 26, 2024," just over seven weeks after she submitted her resignation. (*Id.*) While the FAC alleges that Ballard *submitted* her resignation and then *agreed* to stay seven more weeks, it does not actually state that she in fact left PMB. The court infers that Ballard eventually resigned because she requests reinstatement (FAC at 8), her EEOC Charge refers to her "constructive discharge on April 26, 2024"[10] (EEOC Charge ¶ 1), and she alleges that she declined an exit interview, which presumably would not have been offered to her unless she separated from PMB. (FAC ¶ 30.)[11]

### III. LEGAL STANDARDS – RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the complaint's legal sufficiency. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). But a complaint that "tenders

---

[10] The plaintiff also states that her constructive discharge occurred on March 6, 2024 (EEOC Charge ¶ 9; FAC ¶ 29; Doc. No. 25 at 13 (citing FAC ¶ 29)), and that "her constructive discharge beg[an] in February of 2024 and end[ed] on April 26, 2024." (Doc. No. 25 at 4.)

[11] The FAC contradicts the EEOC Charge regarding whether the plaintiff had an exit interview. (*Contrast* EEOC Charge ¶ 9 ("At her exit interview, [Ballard] was required to meet with one of [PMG]'s attorneys."), *with* FAC ¶ 30 ("Ballard was offered an exit interview with one of Defendant's attorneys, but Ballard politely declined.").)

7

'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557).

## IV.     DISCUSSION

### A.     Timeliness & Exhaustion

Before filing suit in federal court, a Title VII plaintiff must first exhaust her administrative remedies by filing a charge of discrimination with the EEOC and receiving a right-to-sue letter. *Alexander v. Univ. of Memphis*, No. 20-5426, 2021 WL 2579973, at *3 (6th Cir. June 7, 2021) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018)). Two deficiencies with EEOC charges can provide appropriate bases for dismissal. First, in Tennessee, a plaintiff must file an EEOC charge within 300 days of discriminatory acts, or else Title VII bars claims related to those actions. *Jones v. City of Franklin*, 309 F. App'x 938, 944 (6th Cir. 2009) (citations omitted). The plaintiff filed the EEOC Charge on September 12, 2024, so only discriminatory employment actions alleged to have taken place on or after November 17, 2023 were timely raised. (Doc. No. 19-1 at 3.) Most of the allegations in the EEOC Charge and the FAC concern events before November 2023. Second, "as a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her . . . charge." *Davis v. Univ. of Toledo*, No. 25-3296, 2026 WL 179990, at *7 (6th Cir. Jan. 22, 2026) (alterations adopted) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (omission in *Davis*)).

The defendant argues that the court should dismiss any claims arising out of the majority of the FAC's allegations that were either not included in the EEOC Charge or were untimely, including any claims stemming from Ballard's allegations regarding her 2012 complaint and resulting demotion, her 2020 complaint regarding unspecified harassment and discrimination, her 2022 presentation to PMG's Administration Team, and her February 2023 meeting with company officials regarding hostile work environment and discrimination. (Doc. No. 19 at 4–6.)

8

The plaintiff appears to concede the defendant's point regarding timeliness as to certain allegations. Ballard acknowledges that 300 days before she filed the EEOC Charge was November 17, 2023 and states that the "Amended Complaint gives prior-dated acts to add context." (Doc. No. 25 at 5.) That is, "these additional facts are not new legal claims requiring separate exhaustion but are only presented to show the broad pattern and growingly severe conditions of discriminatory treatment that led to Ballard's constructive discharge." (*Id.*) In any case, the plaintiff argues, the EEOC Charge timely raised, and the FAC alleges, "her constructive discharge beginning in February of 2024 and ending on April 26, 2024."[12] (*Id.* at 4.) The court notes that it is not required to "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (citation omitted). And alleging constructive discharge is a legal conclusion. *Accord Ali v. City of Cleveland*, No. 1:23-cv-00157, 2025 WL 2653592, at *8 (N.D. Ohio Sept. 16, 2025) ("The assertion that one has been constructively discharged, without more, is not a factual averment but a legal conclusion not entitled to any weight when addressing a motion to dismiss.").

Ballard also refers to an anticipatory argument the defendant made in its Memorandum regarding the continuing violation doctrine. (Doc. No. 25 at 5–6; *see* Doc. No. 19 at 6.) The continuing violation doctrine provides that, when "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Singh v. Procter & Gamble Co.*, No. 23-3414, 2024 WL 2070683, at *2 (6th Cir. Jan. 24, 2024) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000)). The "continuing-violation theory is only available for hostile-work-

---

[12] The plaintiff does not clarify why her constructive discharge began in February 2024, other than that is when the IT Director tore up her papers and threw them away. (FAC ¶ 28.) Moreover, the plaintiff does not allege any events between March 6, 2024, when she submitted her resignation, and April 26, 2024, when, the court infers, she actually separated from PMB.

9

environment claims." *Phillips v. Shelby Cnty.*, No. 23-5118, 2024 WL 3384190, at *3 (6th Cir. July 9, 2024) (citing *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 613 (6th Cir. 2020)). The court will discuss the doctrine in greater detail when addressing the plaintiff's claim for hostile work environment.

### B.      Discrimination under Title VII

#### 1.      *Allegations of Race-based discrimination*

Title VII prohibits employers from discriminating on the basis of race. 42 U.S.C. § 2000e-2(a)(1). The plaintiff alleges discrimination on the basis of her race under three theories: disparate treatment, a hostile work environment, and constructive discharge. (FAC ¶ 33.) "Title VII plaintiffs need not allege the elements of a prima facie case under the familiar *McDonnell Douglas* framework to avoid dismissal." *Lee v. Vanderbilt Univ.*, No. 22-5607, 2023 WL 4188341, at *3 (6th Cir. June 22, 2023). Nevertheless, "[i]t is axiomatic that, to state a claim of race discrimination under Title VII, the plaintiff must plead facts which allow the court to infer that the employer's wrongful termination related to the plaintiff's race." *Flynn v. Memphis Pathology Lab. (AEL)*, No. 2:19-2882-cv-SHL-TMP, 2020 WL 5801087, at *4 (W.D. Tenn. Sept. 29, 2020) (dismissing the Title VII termination claims "[b]ecause there are no factual allegations to support different treatment based on race"). That is, the plaintiff must allege facts from which the court can reasonably infer that the employer's misconduct occurred because of the plaintiff's race. *See Doe v. Blanche*, No. 25-1442, 2026 WL 1211480, at *4 (6th Cir. May 4, 2026) ("'Harassment is based on' a plaintiff's protected category 'when it would not have occurred but for the plaintiff's' membership in that category; in other words, the harassing conduct must have occurred *because of* the plaintiff's protected trait." (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).

10

### 2. *The Continuing Violation Doctrine*

The court earlier described the continuing violation doctrine, under which "a charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 866 (6th Cir. 2025) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) (omission in *Hayes*)). A continuing violation occurs not on one day, but "over several incidents that are not themselves actionable." *Robinson v. Genesee Cnty. Sheriff's Dep't*, No. 18-2099, 2020 WL 1486792, at *1 (6th Cir. Jan. 7, 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)). By contrast, "discrete events that are easily identifiable and separately actionable do not constitute a continuing violation." *Norman v. Granson*, No. 18-4232, 2020 WL 3240900, at *2 (6th Cir. Mar. 25, 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)). The Sixth Circuit has "recognized two categories of continuing violations: (1) 'those alleging serial violations' and (2) 'those identified with a longstanding and demonstrable policy of discrimination.'" *Id.* (quoting *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003)).

The defendant argues that many of the FAC's allegations are time-barred and that the continuing violation doctrine does not apply because the plaintiff has not alleged ongoing discriminatory actions or an established policy of racial discrimination. (Doc. No. 19 at 6 (citing *Nicholson v. City of Clarksville*, No. 3:11-cv-0355, 2011 WL 4729759, at *3 (M.D. Tenn. Oct. 5, 2011)).) The plaintiff appears to argue that both categories of continuing violations apply. First, she argues that she has alleged a long-standing pattern of discrimination. (Doc. No. 25 at 5–6 (citing FAC ¶¶ 11–12).) She points to Paragraph 11 of the FAC, which alleges that, throughout Ballard's employment with PMB, it "had very few African American employees and of those it did employ, many were forced out or terminated." (FAC ¶ 11.) In addition, Paragraph 12 alleges

11

that, in 2012, Ballard reported "racial discrimination from her Caucasian supervisors," but company leadership did not address her concerns. (*Id.* ¶ 12.) To invoke the second category of continuing violations, however, a plaintiff "must demonstrate something more than the existence of discriminatory treatment in his case." *Basista Holdings, LLC v. Ellsworth Twp.*, 710 F. App'x 688, 693 (6th Cir. 2017) (quoting *Sharpe*, 319 F.3d at 268). So Ballard's allegation regarding the defendant's allegedly longstanding discriminatory behavior toward *her* does not advance her argument that PMB had an established policy of discrimination. And the plaintiff's allegation that PMB had few African American employees, who were forced out or terminated, even if true, does not suggest that PMB's "'standing operating procedure' included intentional discrimination against the class of which plaintiff was a member." *Austion v. City of Clarksville*, 244 F. App'x 639, 647 (6th Cir. 2007) (quoting *Sharpe*, 319 F.3d at 269).

Second, the plaintiff argues that she has alleged ongoing discrimination, starting with her 2012 complaint, continuing with her 2020 complaint, and, "[f]rom there, the Amended Complaint gets detailed in dates, times, names and actions." (Doc. No. 25 at 6 (citing FAC ¶¶ 12, 14).) The court assumes without deciding that the continuing violation doctrine applies to the allegations giving rise to the plaintiff's hostile work environment claim, which are not actionable as discrete events. *Norman*, 2020 WL 3240900, at *3. As previously mentioned, the "continuing-violation theory is only available for hostile-work-environment claims." *Phillips*, 2024 WL 3384190, at *3 (citing *O'Donnell*, 833 F. App'x at 613).

### 3. Hostile Work Environment

A plaintiff may prove a violation of Title VII by showing harassment that created a racially hostile work environment. *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 383 (6th Cir. 2025) (citing *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)). At the motion to dismiss stage, Ballard only needs to allege sufficient facts from which the court, "informed by its judicial

12

experience and common sense, could draw the reasonable inference that [Ballard] was subjected to a hostile work environment." *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 377 (6th Cir. 2026) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (internal quotation marks omitted)).

A "hostile work environment exists when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). And while a plaintiff need not show "significant" harm, he must show "some harm respecting an identifiable term or condition of employment." *McNeal v. City of Blue Ash*, 117 F.4th 887, 904 (6th Cir. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)). Thus, the court must determine whether the FAC contains well-pleaded facts from which the court, using its judicial experience and common sense, can draw the reasonable inference that Ballard's workplace was permeated with racially discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to create an abusive working environment. The court finds that it does not.

> a. *Whether the Alleged Harassment was Based on Race*

The court agrees with the defendant that the plaintiff's few references to race-based discrimination are vague and conclusory. The plaintiff alleges that, in 2012 and then again in 2020, she made complaints regarding discrimination based on race, but she does not explain what the discrimination consisted of. (*See* FAC ¶ 12 (describing only a "complaint of racial discrimination"); *id.* ¶ 14 (describing her 2020 complaint to her supervisor that "the harassment and discrimination was based on Ballard's race").) These allegations, insofar as they purport to

13

allege discrimination, are conclusory and not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 680–681. The remaining allegations of discrimination, the defendant argues, are not alleged to be based on the plaintiff's race, nor are they sufficiently severe or pervasive to constitute a hostile work environment. (Doc. No. 19 at 9–10.) Again, the court agrees.

As a preliminary matter, the FAC alleges that some of the discriminatory conduct came from Caucasian colleagues or supervisors. (FAC ¶¶ 12, 15, 18, 19.) But the mere fact that her supervisors were white and she is African American, does not, in and of itself, allow the court to draw the inference that their alleged mistreatment of her was motivated by race. *Accord Ramsey v. Frisch's*, No. 1:16-cv-1129, 2016 WL 7637287, at \*2 (S.D. Ohio Dec. 9, 2016) ("Plaintiff's assertion that the manager who terminated him is Caucasian is not sufficient to support the inference that defendant terminated plaintiff on account of his race."), *R. & R. adopted*, 2017 WL 25553 (S.D. Ohio Jan. 3, 2017).

While the plaintiff does not provide details regarding the alleged discrimination on the basis of race, as the court has explained above, where the plaintiff does provide details regarding the alleged discrimination, she either does not allege the motivation for the alleged mistreatment or provides race-neutral explanations. For example, in a February 2023 meeting with company leaders, Ballard raised "concerns of a hostile work environment and discrimination." (FAC ¶ 18.) Specifically, her concerns related to "favoritism, unfair treatment, and conflicts of interest" (*id.* ¶ 18), which are not, without explanation, race-based concerns. The plaintiff's further description of unfair treatment does not implicate race. (*See id.* (giving, as an example of her concerns that an "ongoing reimbursement issue[]" required her to "consistently make the necessary corrections, adding to her workload").) The plaintiff refers to her allegation that company leaders did not accept "DEI recommendations" she made during a presentation. (Doc. No. 25 at 8; *see* FAC ¶¶ 15–16.)

14

The plaintiff does not allege that the defendant declined to implement her suggestions regarding workplace morale because of her race. (*Id.* ¶ 16.) After making those suggestions, the plaintiff alleges that the "discrimination and hostile work environment worsened," but she does not explain what the underlying discrimination and hostility consisted of or how it worsened. (*Id.* ¶ 17.)

The plaintiff refers to "incidents of differential treatment, exclusion, and disrespect from Caucasian colleagues." (Doc. No. 25 at 8–9 (citing FAC ¶¶ 15, 17–18, 26–27).) But the interpersonal issues the plaintiff alleges do not concern race, even construing the FAC in the light most favorable to the plaintiff. A physician "condescendingly" referred to her and her staff as "her and her minions." (*Id.* ¶ 26.) Even if the comment was condescending, the FAC does not allege how that comment is or could be construed as *racially* insensitive; nor does the FAC allege that the physician targeted her with disrespect because of her race. The FAC alleges that her colleagues "would not acknowledge [her] presence" on phone calls and once discussed her son's arrest when they thought she was no longer on the call. (*Id.* ¶ 27.) In her Response, the plaintiff characterizes the conversation about her son as "showing racial stereotyping and humiliation" (Doc. No. 25 at 9), but the pleading does not support that characterization—it alleges only that certain colleagues, after a conference call, "started discussing Ballard's son and his recent arrest." (FAC ¶ 27.) The court cannot infer racial stereotyping on the facts in the pleading. In a similar vein, the plaintiff alleges that her colleague tore her "papers apart in front of her face." (*Id.* ¶ 28.) In her Response, the plaintiff characterizes that episode as "symbolic of the contempt and hostility she faced after years of raising race-related concerns." (Doc. No. 25 at 9.) But the plaintiff does not allege that her colleague tore her papers because of her race, and in fact she explains that he was "upset and agitated that Ballard completed a coding task without him." (FAC ¶ 28.)

15

Ballard alleges that, in 2023 (as the court construes the allegations), the "hostile work environment worsened, and as many departments were already downsized, Ballard was given even more work that forced her into voluminous overtime hours without extra pay due to being on salary." (*Id.* ¶ 22.) The court construes the FAC to allege that PMG's downsizing and the resulting extra work Ballard was made to do caused the hostile work environment. If there is a separate explanation for the worsening environment, the FAC does not allege it. The plaintiff alleges that she was not compensated for this extra work but explains that this is because she was "on salary." (*Id.*) That is, salaried employees like her were ineligible for overtime pay. The plaintiff alleges that her request for more staff was denied because PMG "can't afford more coders." (*Id.* ¶ 25.) Her request to work remotely was denied because she was "needed on campus." (*Id.* ¶ 23.) The FAC simply does not allege that Ballard was overworked and underpaid because of her race, or that any employees outside of the protected class were treated more favorably with respect to work hours, support staff, or remote work arrangements.

While the court construes the FAC to allege that her superiors and colleagues were unkind to her, the court cannot infer, without any allegations to support such an inference, that the unkindness was due to the plaintiff's race. The court cannot construe the FAC to allege a "pattern of race-based marginalization and intimidation," as the plaintiff argues. (Doc No. 25 at 9.) The one exception to this conclusion is the plaintiff's allegation that, after the Maintenance department ignored her work order requesting the installation of book cabinets in her office, she had "her Caucasian peers place work orders for her," which were swiftly addressed. (FAC ¶ 20.)[13]

---

[13] The plaintiff also argues that her 2012 demotion constitutes "race-linked harassment." (Doc. No. 25 at 8.) The plaintiff did not mention her demotion in the EEOC Charge, so it was not administratively exhausted, nor, had she mentioned it, would it have been timely raised unless the continuing violation doctrine applies to it. And even though the court has assumed that the continuing violation doctrine applies to some of the defendant's allegedly discriminatory conduct,

16

To constitute a hostile work environment, the discrimination must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Strickland v. City of Detroit*, 995 F.3d 495, 505 (6th Cir. 2021) (quoting *Harris*, 510 U.S. at 21). Courts must consider the "totality of the circumstances," which "may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 687 (6th Cir. 2024) (first quoting *Randolph*, 453 F.3d at 733; and then quoting *Harris*, 510 U.S. at 23). This "standard filters out complaints merely attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, discriminatory jokes, and occasional teasing.'" *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 348 (6th Cir. 2020) (alteration adopted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The parties disagree about whether the alleged conduct suffices under the "severe or pervasive test." (*Contrast* Doc. No. 19 at 9–10, *and* Doc. No. 26 at 4, *with* Doc. No. 25 at 9–10.)

Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Put another way, the "conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's protected status." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (alteration adopted) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012)).

---

it does not apply to discrete events, like demotions. *See Blanche*, 2026 WL 1211480, at *5 (noting that the doctrine "applies when employees 'allege *not* that they suffered a tangible employment injury (such as a firing or demotion), but that their workplace was so riddled with racial or sexual abuse that it affected the "terms" or "conditions" of their employment.'" (quoting *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1015 (6th Cir. 2022) (emphasis added))).

17

The plaintiff has alleged that her office was populated by what some would call "jerks." But she has not alleged conduct sufficiently severe or pervasive to create an abusive working environment. *Accord Parker v. Hankook Tire Mfg. Tennessee, LP*, No. 23-5208, 2023 WL 10404971, at \*4 (6th Cir. Dec. 21, 2023) (affirming dismissal of the plaintiff's Title VII hostile-work-environment claim where the plaintiff alleged that "certain coworkers and superiors slandered, mocked, disrespected, threatened, or ignored him"). Indeed, "[m]ere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (citing *Oncale*, 523 U.S. at 80). And in this case, the plaintiff has alleged no "facts showing that [her] coworkers' and superiors' alleged conduct was motivated by discriminatory animus," with the possible exception of one unanswered maintenance request. *Parker*, 2023 WL 10404971, at \*4 (citing *Khalaf*, 973 F.3d at 484).

### 4.    *Constructive Discharge*

The plaintiff rests her constructive discharge claim on the existence of a hostile work environment, which is what the Supreme Court has referred to as a "hostile-environment constructive discharge claim." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). (*See* Doc. No. 25 at 11 ("Defendant deliberately permitted an environment so hostile that a reasonable person would feel compelled to resign. Accordingly, Plaintiff has sufficiently stated a claim for constructive discharge.").) The "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Brown v. Metro. Gov't*, 722 F. App'x 520, 526 (6th Cir. 2018) (citing *Suders*, 542 U.S. at 149). *See also Burns v. Berry Glob., Inc.*, No. CV 5:20-044-DCR, 2021 WL 895642, at \*15 (E.D. Ky. Mar. 9, 2021) ("A constructive discharge claim presupposes that a plaintiff has properly alleged racial discrimination."), *aff'd,* No. 21-5359, 2022 WL 351769 (6th Cir. Feb. 7, 2022). The court has found that the plaintiff has not stated a claim

18

for a hostile work environment, so her hostile work environment constructive discharge claim also fails.[14]

### 5. *Disparate Treatment*

To succeed on a Title VII claim for disparate treatment based on race, a plaintiff must demonstrate that "adverse employment decisions would not have been made 'but for' her race." *King v. Gould*, 124 F.3d 198 (6th Cir. 1997) (quoting *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988)). That is, "to prevail on a Title VII disparate-treatment claim, a plaintiff must prove that the defendant intentionally discriminated against him because of a protected trait." *Hittle v. City of Stockton* 145 S. Ct. 759, 759 (2025) (Thomas, J., dissenting from denial of certiorari) (citing 42 U.S.C. § 2000e–2(a)(1)). As the court noted, and as the plaintiff emphasizes, she need not make out a *prima facie* case at the motion to dismiss stage; she need only state a plausible claim for relief. (Doc. No. 25 at 6–8.) Even on the liberal pleading standard, though, a Title VII plaintiff must "allege facts to support a 'plausible explanation for how he was discriminated against based on his race.'" *Donaldson v. DeJoy*, No. 22-1651, 2024 WL 3493870, at *3 (6th Cir. May 1, 2024) (quoting *White v. Coventry Health & Life Ins. Co.*, 680 F. App'x 410, 415–16 (6th Cir. 2017) (alteration adopted)). At a minimum, therefore, Ballard must allege an adverse employment decision and its race-based motivation.

---

[14] Ballard's allegation that the "Defendant through Liverett," her supervisor, asked her to stay on for six months after she submitted her resignation undermines the plausibility that the Defendant intended her to quit, which plaintiffs must show to succeed on a constructive discharge claim. *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 495 (6th Cir. 2017) (noting that a plaintiff must show that the employer created intolerable working conditions "with the intention of forcing the employee to quit" (quoting *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x. 414, 420 (6th Cir. 2015))). And Ballard's decision to stay seven weeks after submitting her resignation on March 6, 2024 (FAC ¶ 29)—without any explanation—undermines the plausibility that the working conditions were, as the plaintiff puts it, "so intolerable that Plaintiff 'was left with no choice but to submit her resignation.'" (Doc. No. 25 at 11 (quoting FAC ¶ 29).)

19

The defendant argues that the FAC does not meet the low threshold to survive a motion to dismiss. First, the defendant argues, the FAC's allegations concerning race-based discrimination are vague. (Doc. No. 19 at 7–8.) Second, the defendant argues, the FAC's remaining allegations do not concern race at all. Rather, as the defendant puts it, the FAC alleges a "series of ordinary workplace grievances unrelated to race." (*Id.* at 8 (citing FAC ¶¶ 19–28).) In her Response, the plaintiff argues that the FAC adequately alleges that PMB "intentionally treated her less favorably because of her race." (Doc. No. 25 at 8.) In support, she refers to the FAC's allegations of "(1) repeated racial complaints ignored by white supervisors, (2) an all-white administrative team dismissing her DEI initiatives, (3) materially worse treatment compared to white colleagues, and (4) constructive discharge following protected activity." (Doc. No. 25 at 7–8 (citing FAC ¶¶ 12–20, 25, 29)

As the court has discussed, the plaintiff has not plausibly alleged discriminatory conduct that she timely raised with the EEOC. The only non-conclusory allegation of her white colleagues receiving better treatment relates to one unanswered work request. Moreover, to state a Title VII employment a discrimination claim, a plaintiff must plead an adverse employment action. *Brownlee v. 41B Dist. Ct.*, No. 24-CV-12745, 2025 WL 2712826, at *6 (E.D. Mich. Sept. 23, 2025) (citing *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 723 (E.D. Mich. 2021)). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 403 (6th Cir. 2025) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The only allegation in the FAC that could be considered an adverse employment action is the plaintiff's alleged constructive discharge. *See Funk v. City of Lansing*, 821 F. App'x 574, 580 (6th Cir. 2020) (noting that

20

constructive discharge is "an adverse employment action for purposes of Title VII") (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)). But the court has found that Ballard has not adequately pled constructive discharge. Thus, the plaintiff has not stated a claim for discrimination under a disparate treatment theory, or any other. Accordingly, Ballard's discrimination claim (Count I) will be dismissed.

### C. Retaliation

Title VII also prohibits employers from retaliating against employees for opposing a discriminatory practice. *Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022) (citing 42 U.S.C. § 2000e-3(a)). To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show that "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Lee v. Dana, Inc.*, No. 24-1964, 2025 WL 1684347, at *3 (6th Cir. June 16, 2025) (quoting *Niswander v. Cincinnati Ins.*, 529 F.3d 714, 720 (6th Cir. 2008) (omission in *Lee*)). To survive a motion to dismiss, however, the plaintiff must only "plead sufficient facts from which we can plausibly conclude that the [defendant] retaliated against him because he engaged in a protected activity." *Donaldson*, 2024 WL 3493870, at *4 (citing *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1060-61 (6th Cir. 2022)).

PMB moves to dismiss the retaliation claim on the basis that the plaintiff has not pled an adverse action and describes the plaintiff's only protected activities as occurring in 2020 and 2023. (Doc. No. 19 at 12–13.) Ballard responds that she engaged in protected activity when she "repeatedly complained about racial discrimination," including in 2012, 2020, 2022, and 2023. (Doc. No. 25 at 12 (citing FAC ¶¶ 12, 14–16, 18).) Furthermore, Ballard argues that many of the allegations in the FAC were adverse actions made by the defendant in response to her protected

21

activity. (*Id.* at 12–13 (citing FAC ¶¶ 17–20, 22–23, 25–29).) The plaintiff states that, "[a]fter her 2012, 2020, and 2022 race-related complaints, the discrimination and hostile work environment worsened." (*Id.* at 12.) Ballard notes that she was assigned extra responsibility without pay, was not permitted to work remotely, that a physician referred to "her and her minions," she was "discussed disparagingly by colleagues," and a coworker tore her papers up and threw them away. (*Id.* at 12–13.) The plaintiff points "especially" to her demotion in 2012, her "increased workload without [extra] pay," and her constructive discharge as materially adverse events. (Doc. No. 25 at 13.) None are persuasive on this point. The plaintiff did not mention her 2012 demotion in the EEOC Charge. The plaintiff explains both her increased workload and why she did not receive overtime pay: "many departments were . . . downsized" and she did not receive extra pay "due to being on salary." (FAC ¶ 22.) And the court has found that Ballard was not constructively discharged.

Nevertheless, Title VII sets a lower bar for what constitutes an adverse employment action for retaliation claims than discrimination claims. *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 (6th Cir. 2019) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But the court need not decide whether the plaintiff has alleged any adverse employment actions for purposes of her retaliation claim because the plaintiff does not tie any possible materially adverse action to her protected activity. For example, Ballard's claim that she was "denied support, staffing, and IT assistance" is not alleged to be related to her complaints regarding discrimination. (Doc. No. 25 at 12 (citing FAC ¶¶ 19–20, 25).) That is, her unanswered 2019 maintenance request and the delay in resolving

22

her 2023 "IT phone extension issue" are not alleged to have been in response to any protected activity. (FAC ¶¶ 19–20.) And Ballard herself pleads the reasons for the denial of her request for additional staff (cost), the denial of her remote work accommodation (she was "needed on campus"), and the reason her colleague tore up her papers (Ballard "completed a coding task without him"). (*Id.* ¶¶ 23, 25, 28.) Nor does Ballard explain her description of a physician's allegedly disrespectful comment as one of many "retaliatory conditions." (Doc. No. 25 at 12–13.) The plaintiff has not stated a claim for retaliation. Accordingly, the plaintiff's claim of retaliation (Count II) will be dismissed.

## V.  CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be granted and the FAC will be dismissed without prejudice.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

23